**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| OPTIMUM CONSTRUCTION, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action  MJM-21-2432 |
| HARBOR BUSINESS COMPLIANCE CORPORATION | * | |
| t/a HARBOR COMPLIANCE, | * | |
| Defendant. | * | |

* * * * * * * * * * *

**MEMORANDUM OPINION AND ORDER**

Optimum Construction, Inc. ("Optimum" or "Plaintiff") commenced this civil action against Harbor Business Compliance Corporation t/a Harbor Compliance ("Harbor Compliance" or "Defendant") in connection with Defendant's alleged failure to timely renew Plaintiff's license to perform work in the District of Columbia. (Compl., ECF No. 1). In particular, the Complaint asserts claims for Breach of Contract (Count I), Negligence (Count II), Negligent Misrepresentation (Count III), and Breach of Fiduciary Duty (Count IV). (*Id.*)

Pending before the Court[1] is Defendant's Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(3) (the "Motion"). (ECF No. 16). The Motion is supported by a memorandum of law (ECF No. 16-1, "Def. Mem.") and three exhibits (ECF Nos. 16-2, 16-3 & 16-4). Plaintiff has submitted a memorandum in opposition to the Motion (ECF No. 17-1, "Pl. Mem."), along with two exhibits (ECF Nos. 17-2 & 17-3). Upon invitation of the Court made

---

[1] The parties have consented to proceed before a United States magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF No. 14).

during a telephonic conference on June 14, 2022, each party has filed supplemental memoranda. (ECF Nos. 20, 21, and 22).

The Court has reviewed the parties' memoranda, as well as the pleadings and exhibits, and finds that no hearing is necessary. Loc. R. 105.6. For the reasons stated below, Defendant's Motion is DENIED.

## I.      Relevant Background

Plaintiff Optimum initiated the instant civil action in this Court on September 23, 2021, based on the Court's diversity jurisdiction under 28 U.S.C. § 1332. (Compl. ¶ 1). According to the Complaint, Optimum is a "Maryland corporation engaged in the business of providing general contracting services in both residential and commercial construction throughout the Washington DC Metropolitan area." (*Id*. ¶ 3). Optimum possesses a District of Columbia General Contractor License (the "DC License") issued by the Department of Consumer and Regulatory Affairs ("DCRA") in order to perform work on construction projects in the District of Columbia. (*Id*. ¶ 6). The DC License "must be renewed annually on or before October 31st." (*Id*.)

The Complaint states that defendant Harbor Compliance "is in the business of performing corporate compliance services for businesses, including applying for and renewing business licenses with governmental authorities." (*Id*. ¶ 5). "Harbor Compliance's principal place of business is in Lancaster, Pennsylvania, but it conducts business throughout the State of Maryland and the District of Columbia." (*Id*. ¶ 4).

Optimum hired Harbor Compliance on or about October 9, 2017, "to provide a package of services" (*id.* ¶ 7), including "the timely submission of licensing renewal paperwork" for Optimum's DC License (*id*. ¶ 19). It is alleged that, notwithstanding Optimum's payment of Harbor Compliance's requested fee and reminders regarding Optimum's need for renewal of its

2

DC License in October 2019, Harbor Compliance failed to renew the license before the deadline, and the license expired. (*Id*. ¶¶ 9–15, 21 & 22). Optimum further alleges that "Harbor Compliance concealed from Optimum that the reason for the expiration was its failure to timely file the renewal paperwork as promised." (*Id*. ¶ 14). Due to expiration of the DC License, according to the Complaint, Optimum was "unable to commence any new projects or sign any new contracts for work in the District of Columbia" and "was forced to terminate" certain contracts for marketing lead services. (*Id*. ¶ 15). Optimum ultimately received its DC License again on May 1, 2020, with assistance from Harbor Compliance. (*Id*. ¶ 16). However, according to the Complaint, the interruption in licensure resulted in losses and expenses to Optimum, to include "the loss of new business, the interruption of ongoing projects, and the loss of contracted business that it could not commence." (*Id*. ¶ 17).

Harbor Compliance has moved to dismiss the Complaint based upon improper venue under Rule 12(b)(3) of the Federal Rules of Civil Procedure. Harbor Compliance argues that, during the relevant period, the parties' relationship was governed by a "Terms of Use and Service Agreement" that includes a forum selection clause requiring that any claims for relief be filed only in state or federal courts located in or sitting over Lancaster County, Pennsylvania. On this basis alone, Harbor Compliance argues that the matter should be dismissed. In its supplemental brief, Harbor Compliances requests in the alternative that this case be transferred to a court in Pennsylvania pursuant to 28 U.S.C. § 1404(a) and the doctrine of *forum non conveniens*.

## II.  Dismissal Pursuant to Fed. R. Civ. P. 12(b)(3) and *Forum Non Conveniens*

Rule 12(b)(3) provides that a party may raise the defense of "improper venue" by motion seeking dismissal of claims for relief before filing a responsive pleading. Fed. R. Civ. P. 12(b)(3). "Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the

case was brought satisfies the requirements of federal venue laws[.]" *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 55 (2013). Title 28, United States Code, Section 1391 governs venue for all civil actions brought in federal district courts. 28 U.S.C. § 1391(a)(1). Venue for a civil action in district court is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]" *Id.* § 1391(b)(2). "[A] case filed in a district that falls within § 1391 may not be dismissed under . . . Rule 12(b)(3)." *Devil's Advoc., LLC v. Grynberg Petroleum Co.*, 588 F. App'x 264, 264 (4th Cir. 2014) (quoting *Atl. Marine Const. Co.*, 571 U.S. at 56).

Harbor Compliance offers no evidence or argument that the U.S. District Court for the District of Maryland an improper venue for this case. Optimum states in the Complaint that its principal place of business is in Maryland, (Compl. ¶¶ 3, 5), "a substantial part of the events or omissions giving rise to the claims occurred in this district, and a substantial part of the property that is the subject of this action is situated in this district[,]" (Compl. ¶ 2). The Court has been presented with no evidence that any of the various actions by Optimum that are pleaded in the Complaint actually occurred outside the District of Maryland. *See Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365–66 (4th Cir. 2012) ("On a motion to dismiss under Rule 12(b)(3), the court is permitted to consider evidence outside the pleadings."). Construing the Complaint in the light most favorable to Optimum, *see id.* at 366, the Court may draw a reasonable inference that at least a substantial portion of these events occurred in the District of Maryland. The Court does not find that venue is improper in this district and cannot dismiss the Complaint on this basis.

The only basis asserted by Harbor Compliance for finding improper venue is a forum selection clause contained within a document titled "Terms of Use and Service Agreement" and

"updated" on June 11, 2019 (Def. Exh. A, the "June 2019 Terms"), which Harbor Compliance argues "governed" the parties' relationship "[d]uring the relevant period," (Def. Mem. 3).[2] Indeed, the Governing Law section of the Agreement includes the following forum selection clause:

> Any action arising out of or relating to these Terms of Use or Privacy Policy . . . shall be filed only in state or federal courts located in or sitting over Lancaster County, Pennsylvania, and you hereby consent and submit to the personal jurisdiction of such courts for the purpose of litigating any such action.

(*Id*. at 7). Even where valid and enforceable, however, a forum selection clause pointing to another forum does not render venue in the instant forum improper under Fed. R. Civ. P. 12(b)(3). *UEK Corp. v. Univ. of Manitoba*, Civ. No. 13-3832-GLR, 2015 WL 11027768, at *1 (D. Md. Feb. 18, 2015) (citing *Atl. Marine Const. Co.*, 571 U.S. at 59).

The United States Supreme Court has held that "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*[,]" and not through Rule 12(b)(3). *Atl. Marine Const. Co.*, 571 U.S. at 60; *see also BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea Def. Acquisition Program Admin*., 884 F.3d 463, 470 (4th Cir. 2018). The doctrine of *forum non conveniens* permits dismissal of a civil action "when the original venue is highly inconvenient and an adequate alternative venue exists." *Id*. at 470–71. In a typical case, the defendant seeking dismissal under *forum non conveniens* "bears a heavy burden in opposing the plaintiff's chosen forum." *Id*. at 471 (quoting *Sinochem Int'l Co. v. Malaysia Int'l Shipping Co*., 549 U.S. 422, 430 (2007)). For cases that have an alternative forum within the federal court system, the doctrine of *forum non conveniens* is codified in 28 U.S.C. §

---

[2] Notably, Optimum avers, the June 2019 Terms is not the same contract described in the Complaint as the basis for Optimum's claim for breach of contract. According to Optimum, the contract alleged in the Complaint was formed through emails and telephone calls between the parties, and it obligated Harbor Compliance to make timely applications for the renewal of Optimum's business license. (Pl. Mem. 4). The June 2019 Terms, Optimum argues, contain no such obligation.

1404(a), which permits the transfer of civil matters between federal courts for reasons of convenience and the interest of justice, rather than dismissal. *Atl. Marine Const. Co.*, 571 U.S. at 50.

Here, dismissal under the doctrine of *forum non conveniens* would be inappropriate because the forum selection clause Harbor Compliance seeks to enforce points to an alternative forum within the federal court system—namely, a district court in the Eastern District of Pennsylvania, the federal district that includes Lancaster County, Pennsylvania. For the foregoing reasons, the Court will deny Harbor Compliance's request to dismiss this matter.

## III.      Transfer Pursuant to 28 U.S.C. § 1404

In the alternative to dismissal, Harbor Compliance requests transfer to a court in Pennsylvania pursuant to 28 U.S.C. § 1404(a). Section 1404(a) permits a district court to transfer a civil action to another judicial district where the action might have been brought "[f]or the convenience of parties and witnesses, in the interest of justice[.]" 28 U.S.C. § 1404(a). In deciding whether a transfer of venue is warranted in the typical case, a district court must weigh several factors: "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Trustees of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015). "As a general rule, a plaintiff's choice of venue is entitled to substantial weight in determining whether transfer is appropriate." *Id.* (internal quotation marks and citation omitted).

However, when a contract between the parties contains a forum selection clause, the general rule does not apply and the usual § 1404(a) analysis is significantly altered. *Atl. Marine Const. Co.*, 571 U.S. at 63. "[A] proper application of § 1404(a) requires that a forum-selection clause be 'given controlling weight in all but the most exceptional cases[,]'" *id.* at 59–60 (citation

omitted), as it "represents the parties' agreement as to the most proper forum[,]" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988). When considering transfer pursuant to a forum selection clause, the court must determine whether the forum selection clause is "contractually valid[,]" *Atl. Marine Const. Co.*, 571 U.S. at 62, n.5; whether it is "mandatory rather than permissive," *BAE Sys. Tech. Sol. & Servs.*, 884 F.3d at 470; and whether the plaintiff's claims "fall within the scope of the clause[,]" *Open Text Corp. v. Grimes*, 262 F. Supp. 3d 278, 287 (D. Md. 2017) (citation omitted). *See also Ripley v. Long Distance Relocation Servs., LLC*, Civ. No. CCB-19-0373, 2019 WL 5538343, at *2 (D. Md. Oct. 25, 2019); *Brown v. Emery Fed. Credit Union*, Civ. No. DLB-21-591, 2022 WL 991387, at *2–3 (D. Md. Mar. 31, 2022).

A valid, mandatory, and applicable forum selection clause is presumptively enforceable, but that presumption may be overcome by a clear showing that enforcing the clause would be unreasonable. *Allen v. Lloyd's of London,* 94 F.3d 923, 928 (4th Cir. 1996) (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)); *see also BAE Sys. Tech. Sol. & Servs.*, 884 F.3d at 470 ("As a general matter, courts enforce forum selection clauses unless it would be unreasonable to do so."); *Gilman v. Wheat, First Sec., Inc.*, 692 A.2d 454, 462–63 (Md. 1997) (adopting *The Bremen*, and citing *Allen*, among other cases). "[A] forum selection clause may be found unreasonable if: (1) [its] formation was induced by fraud or over-reaching; (2) the complaining party will for all practical purposes be deprived of his day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) [its] enforcement would contravene a strong public policy of the forum state." *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 651 (4th Cir. 2010) (quoting *Allen*, 94 F.3d at 928) (internal quotation marks and citations omitted); *see also Gilman*, 692 A.2d at 462–63.

Courts deciding motions to enforce a forum selection clause may consider matters outside of the pleadings. *See*, *e.g.*, *Ripley v. Long Distance Relocation Servs.*, *LLC*, Civ. No. 19-0373-CCB, 2019 WL 5538343, at *3 (D. Md. Oct. 25, 2019); *Brown v. Emery Fed. Credit Union*, Civ. No. 21-591-DLB, 2022 WL 991387, at *3 (D. Md. Mar. 31, 2022) (citing cases); *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2004).

The forum selection clause at issue here provides that "[a]ny action arising out of or relating to these Terms of Use or Privacy Policy . . . shall be filed only in state or federal courts located in or sitting over Lancaster County, Pennsylvania[.]" (Def.'s Exh. A at 7). By its own terms, the provision is mandatory in that it requires any civil action relating to the June 2019 Terms to be filed in Pennsylvania and does not permit filing in the District of Maryland. The more difficult question is whether the forum selection clause is valid as a matter of contract law. Maryland contract law will apply because the case is before this Court on diversity jurisdiction. *See Muriithi v. Shuttle Exp., Inc*., 712 F.3d 173, 179 (4th Cir. 2013) ("For questions of contract formation and validity, federal courts apply state law."); *Koch v. Am. Online, Inc.*, 139 F. Supp. 2d 690, 693 (D. Md. 2000) ("In [cases based on diversity jurisdiction], the Fourth Circuit applies the relevant state law."); *UEK Corp.*, 2015 WL 11027768, at *1 ("a federal court sitting in diversity must apply the law of the state in which the court is located").

### A.  Applicable Principles of Contract Law

Under Maryland law, "[a] contract is formed when an unrevoked offer made by one person is accepted by another." *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 85 (4th Cir. 2016) (quoting *Cnty. Comm'rs for Carroll Cnty. v. Forty W. Builders, Inc.*, 941 A.2d 1181, 1209 (Md. Ct. Spec. App. 2008)). "[A] prerequisite to the formation of a contract is mutual assent between the parties." *Id*. "More particularly, mutual assent requires at the outset that each party

8

knows of and manifests an intent to be bound by the contract terms." *Watkins v. Carr*, Civ. No. PX-17-0819, 2018 WL 10741730, at *2 (D. Md. Jan. 12, 2018) (citing *Galloway*, 819 F.3d at 85). "The party seeking to enforce the contract must produce evidence demonstrating mutual assent." *Id.*

The forum selection clause at issue here is part of an Internet-based contract of adhesion, wherein the operator of a website unilaterally sets terms governing use of the website, and website users and customers lack any reasonable opportunity to negotiate the terms. In deciding whether these terms constitute a valid and enforceable contract, courts apply traditional principles of contract law and focus on whether the website user had actual or constructive knowledge of the site's terms and manifested assent to them. *See*, *e.g.*, *CoStar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 669 (D. Md. 2009); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75–76 (2d Cir. 2017).

Courts conduct a "fact-intensive inquiry" to determine whether an online adhesion contract is supported by the user's assent or inquiry notice. *Selden v. Airbnb, Inc.*, 4 F.4th 148, 156 (D.C. Cir. 2021) (quoting *Meyer*, 868 F.3d at 76). In doing so, "[c]ourts consider the specific features of the website's interactivity and the visibility of the website's terms of use, including placement of the terms-of-use link, the font size of the link relative to the surrounding text, and whether a site visitor would necessarily have seen some notice regarding the applicable terms of use while using the site." *Watkins*, 2018 WL 10741730, at *3 (citing cases); *see also Selden*, 4 F.4th at 156 ("We look to the layout and language of the site to decide whether it would provide a reasonably prudent smartphone user with reasonable notice that a click—i.e., signing up—will manifest assent to an agreement.") (internal quotation marks and citation omitted).

### B.  Relevant Facts

According to Optimum, as a part of business licensing compliance services it hired Harbor Compliance to perform, Harbor Compliance offered "access to its website for use as a portal to upload and view business documents." (Pl.'s Mem. 2). Harbor Compliance has submitted a copy of an Internet activity log dated August 31, 2020 (Def. Exh. B), documenting activities on its website attributed to a user identified as "Amr Elrahimy," who, according to Harbor Compliance, "accessed [its] website on behalf of Optimum" between October 9, 2017, and June 30, 2020.[3] (Def. Mem. 3). The activity log lists the following events for October 9, 2017, the date Optimum established its online account with Harbor Compliance: "Activation email sent," "User agreed to the terms of service online," and "User signed up." (Def. Exh. B at 22–23). Optimum confirms that, "[t]o login to the website for the first time, and gain access to the stored documents, Optimum was required to enter an email address, create a password and check a box to acknowledge that it had read and agreed to the Harbor Compliance Terms of Use and Service Agreement." (Pl. Mem. 2).

Harbor Compliance asserts that "Optimum accessed Harbor Compliance's website over seventy-five (75) times[,]" and "[e]ach time it did so, Optimum electronically acknowledged and agreed to Harbor Compliance's Terms of Use and Service Agreement online." (Def. Mem. 8). At each log-in, the activity log recorded, "User agreed to the terms of service online[,]" (Def. Exh. B at 2–24), but Optimum states that it only actually confirmed agreement to the terms of use when it first established the account and logged in for the first time in October 2017, (Pl. Mem. 2). According to Optimum, each subsequent time it logged into the account, a checkbox indicating its

---

[3] Amr Elrahimy is the president of Optimum. (Pl. Mem. 5). Optimum claims that Amr Elrahimy never personally accessed Harbor Compliance's website (*id.*), but it does not dispute that Optimum created an account through the website in October 2017 and used the account until June 2020.

agreement to the terms of use was pre-checked "as a default without requiring any affirmative step prior to or during login process." (*Id.*) Defendant offers no evidence to dispute Optimum's description of its experience using Harbor Compliance's website.

Optimum has submitted an undated, color image of a screenshot of Harbor Compliance's log-in webpage. (Pl. Exh. A). The central portion of the log-in page contains the heading "Login to Your Account," and, below the heading are two fields for the user to enter their email address and password as well as a large orange button labeled "Login." Between the two fields and the log-in button is a checked checkbox next to the following statement in small text: "By clicking here, you acknowledge that you have read, you understand, you expressly accept, and you are legally bound by the Harbor Compliance Terms of Use and Service Agreement posted on this website." The phrase "Harbor Compliance Terms of Use and Service" is in colored type, indicating that it is a hyperlink to Harbor Compliance's terms of use.

Notably, the version of the terms of use produced by Harbor Compliance in support of its Motion and containing the forum selection clause at issue here indicates that it was last updated on June 11, 2019. (Def. Exh. A at 1, the "June 2019 Terms"). The June 2019 Terms is dated long after Optimum first acknowledged and demonstrated assent to Harbor Compliance's terms of use via checkbox in October 2017. From that point forward, Optimum avers, Harbor Compliance's website did not require Optimum to take any affirmative step to acknowledge the terms of use, including any updated or modified version of those terms created after October 2017. (Pl. Mem. 2). Again, Defendant offers no evidence to dispute Optimum's description of its experience using the website.

Optimum points out that the forum selection clause in the June 2019 Terms was not bargained for by Optimum and claims that it was not even aware of the forum selection clause.

(*Id.* at 5, 6). As Optimum points out, "[i]t is unclear whether the forum selection clause was the same in the original Terms of Use and Services Agreement when the Website was first available to Optimum in 2017." (*Id.* at 6 n.2). Defendant offers no response to this point.

### C. <u>Analysis</u>

On the present record, the Court cannot determine that the version of the terms of use specifically acknowledged by Optimum contained the same forum selection clause found in the June 2019 Terms submitted by Harbor Compliance, and therefore cannot find that Optimum agreed to the forum selection clause. No evidence has been presented that the terms of use Optimum specifically agreed-to in 2017 contained any forum selection clause at all. Even accepting that the screenshot of the log-in page displays in small type above the log-in button a hyperlink to some version of the terms of use, and that hyperlink was available to Optimum each time it logged into its account, there is no evidence that Harbor Compliance ever notified Optimum that the terms of use had been modified or "updated" at any point. Without notice of any modifications or updates, Optimum would have no reason to review the terms of use at any point after it established its account in October 2017. The Court cannot find that a reasonably prudent user in Optimum's position would have been on inquiry notice of any modifications in Harbor Compliance's terms of use made after Optimum's initial review of the terms in 2017 when the account was established.

If the terms of use were indeed modified to include a forum selection clause after October 2017, and Harbor Compliance never notified Optimum of any such modification, Optimum could have only become aware of the forum selection clause (and any other modifications after October 2017) if it clicked the hyperlink to access and review the "updated" version of the terms periodically when logging into its account. As the U.S. Court of Appeals for the Ninth Circuit has

recognized, "[p]arties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side." *Douglas v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007). "Nor would a party know *when* to check the website for possible changes to the contract terms without being notified that the contract has been changed and how." *Id.* at 1066 n.1. Indeed, without notice from Harbor Compliance, the only way Optimum could have avoided inadvertently accepting modified terms of use it might find unacceptable would be to check the multi-page terms of use hyperlinked on the log-in page against the October 2017 version *every* time before logging into its account. The law does not impose any such burden on website users subject to an online adhesion contract.

This point is well illustrated in an opinion by U.S. District Judge Jon S. Tigar of the U.S. District Court for the Northern District of California on cross-motions for summary judgment filed in a class action against grocery chain Safeway. *Rodman v. Safeway Inc.*, No. 11-CV-03003-JST, 2015 WL 604985, at \*9–\*11 (N.D. Cal. Feb. 12, 2015), *aff'd*, 694 F. App'x 612 (9th Cir. 2017). In that case, the defendant sought to enforce an online adhesion contract against class members who had used Safeway's website for online grocery delivery services. *Id.* at \*9. Terms of the agreement were revised without "conspicuous notice" to online customers, including class members. *Id.* Judge Tigar recognized that the changes made to the terms "represent an offer to which the class members never expressed assent, and class members were therefore not bound by those changes." *Id.*; *see also Douglas*, 495 F.3d at 1066 ("[A] revised contract is merely an offer and does not bind the parties until it is accepted. . . . And generally 'an offeree cannot actually assent to an offer unless he knows of its existence.'") (quoting 1 Samuel Williston & Richard A. Lord, A TREATISE ON THE LAW OF CONTRACTS § 4:13, at 365 (4th ed. 1990)); *Porter v. Gen. Boiler Casing Co.*, 396 A.2d 1090, 1095 (Md. 1979) (recognizing under Maryland law the rule that "an

offer may be communicated by conduct or by words, but must be communicated") (quoting W.

Brantly, LAW OF CONTRACT § 11, at 24 (2d ed. rev. 1922).

> The court in *Rodman* noted further that

>> [a]lthough Class Members were presented with a clickwrap agreement[4] at the time of their registration, they were never presented with a subsequent clickwrap agreement asking them to consent to the revised Special Terms. As was the case in *Nguyen,* [763 F.3d 1171,] Class Members could have completed all their subsequent purchases on Safeway.com without ever visiting the webpage hosting the revised Special Terms which Safeway claims governed the sale and without ever clicking anything on the website that would indicate that they have agreed to those terms. Customers' lack of awareness that the Special Terms have been altered undermines Safeway's claim that each purchase on Safeway.com constitutes an agreement to those changes.

2015 WL 604985, at *11.

Citing *Douglas*, Judge Tigar found that the customers were not obligated to read and scrutinize the terms in their entirety before every purchase they made through the defendant's website. *Id.* "[T]he imposition of such an onerous requirement on consumers would be particularly lopsided, as Safeway is aware that it has—or has not—made changes to the Terms and is the party to the contract that wishes for the new terms to govern." *Id.*; *see also Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 575 F. Supp. 2d 696, 710 n.24 (D. Md. 2008) ("[W]ithout notice that changes have occurred, a user who merely views [an earlier version of an online adhesion agreement] may have no actual notice that changes have been made.") (citing *Douglas*, 495 F.3d at 1066 n.1). *Engen v. Grocery Delivery E-Servs. USA Inc.*, 453 F. Supp. 3d 1231, 1240–41 (D. Minn. 2020)

---

[4] Online terms of use take various forms. One such form of agreement, commonly called "clickwrap agreements," generally require that a user "affirmatively click a box on the website acknowledging receipt of and assent to the contract terms before he or she is allowed to proceed using the website[.]'" *CoStar Realty Info.*, 612 F. Supp. 2d at 669 (citation omitted). Clickwrap agreements are generally deemed valid and enforceable, including under Maryland law. *See id.* (citing cases); *Jones v. Prosper Marketplace, Inc.*, Civ. No. GJH-21-1126, 2022 WL 834210, at *17 (D. Md. Mar. 21, 2022) (citing cases).

(declining to enforce arbitration provisions in modified terms of use where defendant provided hyperlinks to updated versions in promotional emails to customers without specifically noting that the terms had been modified).

Cases like *Rodman*, *Douglas*, and *Engen* stand in sharp contrast with cases in which a service provider gives notice to users and customers about modifications made to their terms of service, or requires users to review or accept updated terms before using the service. *See, e.g.*, *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 301–02 (E.D. Va. 2019), *aff'd sub nom. Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020) (updated terms applied where "Plaintiffs received emails allowing them to opt-out of the updated terms and conditions, and that none of the Plaintiffs did so"); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 549–51 (S.D.N.Y. 2018) (plaintiffs had inquiry notice of arbitration provision in updated terms of service when email notifications were sent to users upon modification of the terms and users were "required to click a button" indicating acceptance of updated terms).

Similar to *Rodman*, in the instant case, Optimum initially agreed to terms of use on Harbor Compliance's website by having terms of use presented to it on the website and checking a checkbox to confirm its agreement to the terms. But that agreement was made in October 2017. Harbor Compliance offers no evidence that the terms of use provided to Optimum when it established its account in October 2017 contained any forum selection clause, that Harbor Compliance subsequently notified Optimum that these terms of use were changed or updated in any way, or that Optimum took any affirmative step to demonstrate assent to the June 2019 Terms or any other modified version of the terms of use that included a forum selection clause. In the absence of any such evidence, the Court cannot find that Optimum had actual or constructive

knowledge that the June 2019 Terms included a forum selection clause or that Optimum demonstrated assent to the forum selection clause.[5]

Even if a hyperlink to an updated version of the terms of use containing a forum selection clause was prominently displayed on the log-in page each of the many times Optimum logged into its account, Optimum was not obligated to re-review the terms of use each time it logged in. *See Rodman*, 2015 WL 604985, at *11. The screenshot of Harbor Compliance's log-in page does not display any notice that the terms of use were updated, and no evidence has been presented that notice of any updates was communicated to Optimum in any other way. Furthermore, there is no evidence that Optimum was prevented from logging into its account and accessing Harbor Compliance's services without first reviewing the updated June 2019 Terms or taking any step to confirm agreement to these updated terms. The pre-checked checkbox, the notice regarding the terms of use, and the hyperlink to the terms of use on the log-in page purport to confirm Optimum's agreement to the terms but provide no actual notice regarding any modifications made to the terms following Optimum's initial agreement in October 2017. Without any showing of Optimum's assent to the July 2019 Terms, Harbor Compliance cannot meet its burden of establishing the validity of the forum selection clause contained therein.

Moreover, on the present record, it would be unreasonable to enforce the forum selection clause against Optimum. On its face, the June 2019 Terms indicate that the terms were updated or modified on June 11, 2019. Harbor Compliance would have over-reached by modifying the terms of use Optimum previously agreed to without notice to Optimum and then binding Optimum to

---

[5] In its supplemental brief (ECF No. 20), Defendant makes much of notices and provisions within the June 2019 Terms requiring users to read the terms before using Harbor Compliance's website. But, if Optimum was never notified of any updates to the terms of use, and Optimum never happened to review the June 2019 update, then it lacked both actual and constructive knowledge of any obligation imposed by the June 2019 Terms—including any obligation to read this version of the terms before making any further use of Harbor Compliance's website or services.

the modified terms by way of a pre-checked checkbox on its log-in page purporting to confirm Optimum's agreement to the modified terms. To enforce a forum selection clause added to Harbor Compliance's terms of use in this manner would be unreasonable. *See Albemarle Corp.*, 628 F.3d at 651 (forum selection clause may be found unreasonable if "[its] formation was induced by fraud or over-reaching"); *Gilman*, 692 A.2d at 463 (same).[6]

In the absence of a valid and enforceable forum selection clause, the Court must accord "substantial weight" to the plaintiff's choice of venue. *Trustees of the Plumbers & Pipefitters Nat. Pension Fund*, 791 F.3d at 444. Here, Plaintiff has chosen to file suit in the District of Maryland, and Defendant has failed to offer adequate evidence or argument to show that the interest of justice or the convenience of the parties and witnesses as a whole would be better served in another district. Defendant falls far short of carrying its "heavy burden" in opposition to Plaintiff's chosen forum. *BAE Sys. Tech. Sol. & Servs.*, 884 F.3d at 471. Optimum's choice of venue will therefore control, and Harbor Compliance's alternative request for transfer will be denied.

## IV.      **Conclusion**

For the reasons stated above, Defendant's Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(3) (ECF No. 16) is DENIED.

September 30, 2022                                                     /S/
Date                                                       Matthew J. Maddox
                                                           United States Magistrate Judge

---

[6] In addition to its argument that the forum selection clause in the June 2019 Terms is unenforceable and unreasonable, Optimum argues that the instant lawsuit is outside the scope of the clause. Pl. Mem. 3–5. By its own terms, the forum selection clause applies only to "[a]ny action arising out of or relating to these Terms of Use or Privacy Policy[.]" Def. Exh. A at 6. Optimum argues that its lawsuit "does not arise out of" Harbor Compliance's terms of use or its privacy policy. Because the Court does not find that the forum selection clause is valid or enforceable in this matter, it need not reach the question of whether this case is within the scope of the clause.

17